HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PHILIP SMITH,

          Plaintiff,

    v.

COUPANG, INC.,

          Defendant.

CASE NO.  3:23-cv-01887-RAJ

ORDER

## I.  INTRODUCTION

THIS MATTER comes before the Court on Defendant Coupang's Motion to Dismiss the Complaint.[1] Dkt. # 58. Plaintiff opposes dismissal. Dkt. # 63. Both parties have made requests for judicial notice and incorporation for reference.  Dkts. # 60, 66. For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendant's Motion to Dismiss.  Dkt. # 58.

---

[1] On July 11, the Court granted Plaintiff's motion for leave to file an amended complaint. Dkt. # 53. Plaintiff filed a Second Amended Complaint, Dkt. # 54, the Court will refer to this document as "the Complaint" throughout this Order.

## II.    BACKGROUND

Plaintiff Philip Smith is an experienced attorney with a specialization in financial crime compliance. Dkt. # 54 ¶ 11. Coupang is one of the largest e-commerce retailers in South Korea and conducts some of its operations in the United States. *Id.* ¶ 2. Mr. Smith and Coupang LLC[2] entered into an agreement on December 2, 2020, which employed Plaintiff as the Senior Director, Head of Anti-Money Laundering Compliance. *Id.* ¶ 96. Plaintiff worked for Coupang Corp. at its office in Seoul, Korea. *Id.* ¶ 1. On February 1, 2021, Mr. Smith started working for Coupang remotely from Amsterdam, and later relocated his family to Korea in April 2021. *Id.* ¶ 21.

In May 2021, Mr. Smith began a review of Coupang's financial crimes risks. *Id.* ¶ 24. During this review, Smith purportedly identified several violations of U.S. and Korean law including failure to establish sound and functional internal controls and inadequate Know Your Customer ("KYC") policies. *Id.* Significantly, Mr. Smith alleges he identified, reported, and pushed for disclosure of Coupang's transactions with Iranian entities to the Securities Exchange Commission ("SEC") to prevent securities and shareholder fraud (the "Iranian transactions"). *See* Dkt. # 54 ¶¶ 25–36.

Plaintiff internally reported these violations to his supervisor, Coupang's Chief Compliance Officer (the "CCO"), in June and July of 2021. *See id.* ¶ 26. These concerns appeared to be dismissed by the CCO, so Plaintiff raised the issues with other corporate officers, including Coupang's Chief Accounting Officer, who was based in in the United States, and an Assistant Corporate Secretary, who was based in Coupang's California

---

[2] There are four Coupang-related entities identified in the Complaint: 1) Coupang LLC; 2) Coupang, Inc.; 3) Coupang Corp.; and 4) Coupang Global LLC. The Court provides the relevant entity relations here. Coupang LLC is Defendant Coupang, Inc.'s predecessor company prior to Coupang, Inc. going public in March 2021. Dkt. # 54 ¶ 2. Coupang Global LLC is a subsidiary of Coupang, Inc. based in California and has a business presence in Washington State. *See id.* ¶ 13, 15; *see also* Dkt. # 30 at 15. Coupang Corp. operates in Seoul, Korea and is a wholly owned subsidiary of Defendant Coupang, Inc., which is incorporated in the state of Delaware. *Id.* ¶ 1. Plaintiff does not specify the "Coupang" entity for most of the allegations in the Complaint, and the Court will not attempt to do so except where an entity is clearly stated in the Complaint or briefing.

office.  *See id.* ¶¶ 29–31.  After this, the CCO allegedly harassed and unwarrantedly reprimanded Plaintiff.  *See id.* ¶¶ 32–34.

In September 2021, Coupang placed Smith on administrative leave and confiscated his work computer and office access badge.  *See id.* ¶ 36.  That same month, Coupang sent Smith a proposed separation agreement that contained a condition that he resign by December 31, 2021.  *See id.* ¶ 38.  Plaintiff obtained local counsel in Korea to provide legal advice and communicate with Coupang on his behalf. Dkt. # 54 ¶ 39. Coupang informed Plaintiff's counsel that Smith, as an employee, would have to participate in an investigation about the disclosure and reporting concerns he raised in June and July 2021.  *See id.* ¶ 40.  While in Korea, Plaintiff obliged and participated in the investigation led by outside counsel and overseen by Coupang's Deputy General Counsel, all of whom were based in the United States at that time.  *See id.* ¶¶ 41–44. Ultimately, Coupang did disclose at least some of the concerns Plaintiff raised in its 10-Q filings with the SEC.  *Id.* ¶ 46.

Despite Coupang placing Smith on administrative leave, the company still required him to participate in the investigation, provided a variety of benefits to him, and did not require him to resign on the date stated in the draft separation agreement.  *See id.* ¶¶ 41–44.  Throughout the leave period, Coupang did not respond to Plaintiff's questions about his employment status.  *See id.* ¶¶ 39, 47.  On January 18, 2022, Coupang's Deputy General Counsel, based in Seattle, sent Plaintiff a letter terminating his employment pursuant to the terms set forth in his employment agreement.  Dkt. # 54 ¶ 49.  Plaintiff filed a Sarbanes-Oxley ("SOX") retaliation complaint with Occupational Safety and Health Administration ("OSHA") on July 15, 2022, appealed the unfavorable decision, and exhausted administrative remedies.  *See id.* ¶ 49.  Defendant now moves to dismiss Plaintiff's case.

### III.    LEGAL STANDARD

The question for the Court on a motion to dismiss is whether the facts alleged in the complaint sufficiently state a "plausible" ground for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In the context of a motion under Rule 12(b)(6), the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). The Court's review is generally limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). Courts are not required "to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

### IV.    DISCUSSION

As an initial matter, the Court will first resolve requests made by both parties for judicial notice and incorporation by reference. *See* Dkts. # 60, 66. Then the Court will turn to the viability of the claims in the Complaint.

#### A.    Judicial Notice and Incorporation by Reference

##### 1.    Judicial Notice

Defendant asks the Court to judicially notice five facts in support of the motion to dismiss: 1) that there has been no Iranian Embassy in the United States since April 1980; 2) Coupang, Inc.'s principal place of business was in Seoul, Korea, until on or about August 2022, at which time the headquarters moved to Seattle, Washington, as reflected by SEC filings; 3) Coupang, Inc. was not registered to do business in the state of Washington until October 21, 2022; 4) Coupang Global LLC is a subsidiary of Coupang,

Inc., as reflected in the registration statement; and 5) Coupang, Corp. is a wholly-owned Korean subsidiary of Coupang, Inc., as reflected in Coupang, Inc.'s 10-K annual report. *See* Dkt. # 60.  Plaintiff asks the Court to judicially notice two exhibits in support of his opposition to the motion to dismiss: 1) the "Iran Notice," filed on August 16, 2021; and 2) date on which Coupang, Inc. filed its June 30, 2021 Quarterly Report (Form 10-Q) disclosing transactions with Iran, specifically August 16, 2021. *See* Dkt. # 66.  Defendant opposes Plaintiff's request in its entirety, Dkt. # 70, and Plaintiff only opposes the Defendant's second request that Coupang, Inc.'s principal place of business was in Seoul, Korea, Dkt. # 67.

A court generally cannot consider materials outside the pleadings on a motion to dismiss for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  A court may, however, consider items of which it can take judicial notice without converting the motion to dismiss into one for summary judgment.  *See Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).  A court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  A court may additionally take judicial notice of "'matters of public record' without converting a motion to dismiss into a motion for summary judgment."  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (cleaned up)).

As an initial matter, the Court takes judicial notice of Defendant's requests 1, 3, 4, and 5.  These requests meet the requirements for judicial notice and there is no dispute over them.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The parties disagree whether the Court should take judicial notice of Defendant's second request to notice the fact that Coupang Inc.'s headquarters, which Defendant purports was the company's principal place of business, was located in Seoul, Korea until August 2022, pursuant to Coupang's 10-Q and 8-K filings with the SEC. The Court acknowledges that courts often judicially notice this type of fact based on SEC filings for diversity jurisdiction purposes. *See e.g.*, *McDonnell v. AMC Ent. Holdings Inc.*, 2022 WL 3274166, at *1 n.2 (S.D.N.Y. Aug. 11, 2022); *Powell v. Delta Airlines*, 145 F. Supp. 3d 189, 198 (E.D.N.Y. 2015). However, the purpose of Defendant's request is to dispute Coupang's domestic conduct with respect to the extraterritorial application of SOX's anti-retaliation provision, discussed *infra* Section IV.B.2. Accordingly, the Court will take judicial notice of the existence of the financial reports, but given the factual dispute over this issue, the Court will not take notice of the truth of the factual assertions made in these filings. *See, e.g.*, *Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 775 (N.D. Cal. 2019); *Forsyth v. HP Inc.*, No. 16-cv-04775, 2021 WL 1391501, at *4 (N.D. Cal. Apr. 13, 2021).

The Court turns now to Plaintiff's opposed request to take notice of the filings Coupang made with the SEC including: 1) the "Iran Notice," filed on August 16, 2021; and 2) the date on which Coupang, Inc. filed its June 30, 2021 Quarterly Report (Form 10-Q) disclosing transactions with Iran, specifically August 16, 2021. *See* Dkt. # 66. The purpose of Plaintiff's request appears to attempt to provide support for the fact that Coupang disclosed the Iranian transactions to the SEC on August 16, 2021. Defendant asserts that this contradicts the facts in the Complaint and improperly asks the Court to take notice of the filings, rather than a specific fact. *See* Dkt. # 70 at 2–4. The Court finds that it is appropriate to take notice of the fact that the date of Coupang's disclosure

of the Iranian transactions to the SEC was August 16, 2021, but it will not take judicial notice of the entire filing.

In sum, the Court takes judicial notice of all of the facts requested. the Court takes full judicial notice of Defendant's requests 1 3, 4, and 5. The Court takes limited judicial notice of Defendant's request of Coupang's headquarters according to its 10-Q and 8-K filings but will not notice the truth of the assertion that it was the company's principal place of business given the factual dispute. The Court will take judicial notice that Coupang disclosed information about the Iranian transactions on August 16, 2021 in quarterly filings with the SEC, but will not take judicial notice of the entire filing.

## 2.    Incorporation by Reference

Defendant asks the Court to incorporate by reference four documents in support of the motion to dismiss: 1) Plaintiff's Employment and Assignment Agreement; 2) the letter from James Roe to Plaintiff, dated January 18, 2022, terminating the employment agreement; 3) the letter from Plaintiff's Korean legal counsel, dated September 14, 2021; and 4) the draft Mutual separation agreement, dated September 14, 2021. *See* Dkt. # 60 at 6–7. Plaintiff only objects to Defendant's third and fourth requests. *See* Dkt. # 67.

A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "[A] court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall*, 629 F.3d at 998; *see also Knieval v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (recognizing that the incorporation doctrine applies "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its

motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint").

As an initial matter, the Court will incorporate by reference Defendant's first and second requests. These requests meet the requirements for incorporation by reference and there is no dispute over them.

Defendant asserts that the third and fourth requests are central to the timeliness of Plaintiff's SOX claim. *See* Dkt. # 68 at 10–12; Dkt. # 69 at 7–10. Plaintiff argues that the court should not incorporate the document by reference because the documents are not central to his claim, but rather they are central to Defendant's statute of limitations defense. *See* Dkt. # 67. The Court finds that it is appropriate to consider these documents given the references to them in the Complaint and relevance to the timeliness of Plaintiff's claim. However, discussed *infra* Section IV.B.1, the Court will limit the inferences and conclusions that can be drawn from these documents. Accordingly, the Court grants Defendant's requests to incorporate by reference and will consider the documents in ruling on the motion to dismiss.

## B.    Sarbanes-Oxley Act

Defendant Coupang makes three arguments for dismissal of Plaintiff's SOX whistleblower claim. Coupang argues Plaintiff's claim must be dismissed because: 1) the statute of limitations has run; 2) Plaintiff seeks an impermissible extraterritorial application of SOX; and 3) Plaintiff failed to establish a prima facie case of retaliation because he failed to allege that he engaged in "protected activity" covered by SOX. *See* Dkt. # 58 at 6–15. The Court reviews each argument below.

### 1.    Statute of Limitations

Defendant argues that Plaintiff's SOX claim is untimely because he brought his claim more than 180 days after the employer communicated the adverse employment action. *See id.* Defendant contends that the time clock began running on September 3, 2021, when Coupang placed Mr. Smith on leave and took his laptop. *See id.* at 15. Plaintiff disagrees, arguing he timely filed the Complaint, because despite the start of the administrative leave in September 2021, the adverse action did not occur until he received his termination letter on January 18, 2022. *See* Dkt. # 63 at 19.

A plaintiff seeking whistleblower protection under SOX must first file an administrative complaint with OSHA, *see* 29 C.F.R. § 1980.103(c), "not later than 180 days after the date on which the violation occurs," 18 U.S.C. § 1514A(b)(2)(D); *see also* 29 C.F.R. § 1980.103(d). The violation occurs "when the discriminatory decision has been both made and communicated to the complainant." 29 C.F.R. § 1980.103(d). A SOX claim accrues "and the statute of limitations beg[ins] to run, when [the employee] learned of the actual injury, *i.e.*, that [the employer] decided to terminate [the] employment." *Coppinger-Martin v. Solis*, 627 F.3d 745, 749 (9th Cir. 2010). Where the adverse employment action was "initially unclear" a court may consider the final date of work where the decision was "unquestionably communicated" to the employee. *See id.*

During the leave period, Coupang continued to keep Plaintiff on payroll, pay for his housing and medical costs, and participated in a company's internal legal investigation. *See* Dkt. # 54 ¶¶ 40–47. These ongoing obligations and benefits are not neutralized by Coupang's confiscation of Smith's work laptop and access badge proposal of a draft separation agreement in September 2021. *See id.* ¶¶ 36, 38. Although Plaintiff's Korean counsel mentioned Smith being placed on "garden leave," in a letter to Coupang, this does not definitively demonstrate that Smith knew he would be fully

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

terminated, especially given the cultural and legal differences in Korean and American employment law. *Id.* ¶ 44. Given the employer's conflicting actions about Smith's employment status, Defendant's conduct did not "unquestionably communicate" to the employee that his position was terminated until January 18, 2022. *See id.* ¶ 49. Therefore, Smith met the 180-day reporting requirement by filing a Complaint with OSHA on July 15, 2022. *See id.* ¶ 9.[3]

After reviewing the facts alleged in the Complaint, the Court cannot determine that the statute of limitations period began on September 3, 2021. There is substantial conduct alleged in the Complaint that demonstrates that any adverse action taken against the employee was initially unclear in September 2021 when the company placed Smith on administrative leave, and termination was only unquestionably communicated by the formal termination letter on January 18, 2022. Accordingly, the Court denies the motion to dismiss on this basis.

## 2.    Extraterritorial Application of SOX

Defendant argues that Plaintiff seeks an impermissible extraterritorial application of SOX because, among other things, he worked for Coupang Corp. in Seoul, Korea. Dkt. # 58 at 17–19. Plaintiff asserts that there is sufficient domestic conduct to support to sustain his SOX anti-retaliation claim. *See* Dkt. # 63 at 19. The parties do not dispute that SOX's anti-retaliation provision does not apply extraterritorially. *See id.*

Sarbanes-Oxley was enacted in 2002 "[t]o safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron

---

[3] Defendant contends that the OSHA determined this matter was untimely. *See* Dkt. # 58 at 14. However, the decision does not appear to be final, Dkt. # 23-4, so *de novo* review in the district court is appropriate. 18 U.S.C. §1514(A)(b)(1)(B); *see, e.g.*, *Tamosaitis v. URS Inc.*, 781 F.3d 468, 488 (9th Cir. 2015)( holding "absent a final decision from the agency within the specified period," the employee may file in federal court, "at which point any findings made by the agency have no preclusive effect," and the "proceedings begin anew in district court"); *Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 420 (S.D.N.Y. 2012) (denying motions to dismiss based on the statutory right SOX provides for *de novo* review in federal court absent a final OSHA decision).

Corporation." *Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014). Congress was particularly concerned "that Enron had succeeded in perpetuating its massive shareholder fraud" by retaliating against and silencing employees who attempted to report misconduct internally or to a federal agency. *Id*. at 435. To address this concern, Sarbanes-Oxley makes it unlawful for covered employers to retaliate against employees in the terms and conditions of employment for reporting possible fraud and violations of securities laws to their supervisors, to a federal agency, or to Congress. 18 U.S.C. § 1514A(a).

To establish a SOX whistleblower claim, a plaintiff "must demonstrate that the locus of [the] employment relationship was 'in United States territory.'" *Daramola v. Oracle Am., Inc.*, 92 F.4th 833, 840 (9th Cir. 2024). Courts determining the locus of the employment relationship consider various facts including, but not limited to the citizenship of the employee, the physical location of employee during the employment, the terms and choice of law provision of the employee's contract, and the location of the employee's supervisors. *See id*.; *see also Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 123 (D.C. Cir. 2022); *Carnero v. Bos. Sci. Corp.*, 433 F.3d 1, 18 (1st Cir. 2006).

There are several facts that support that the locus of the employment relationship was the United States. Importantly, although working in Korea, Plaintiff is a United States citizen. Dkt. # 54 ¶ 1. During the employment, Defendant was a publicly traded company with registered securities, incorporated in Delaware, and directly involved in the management of its wholly owned subsidiary, Coupang Corp. *See id*. ¶¶ 2, 21. California law governs the employment agreement[4], and Coupang treated Plaintiff as an at-will, American employee at his termination. *See id*. ¶¶ 1, 19, 54. In addition, Plaintiff asserts that he worked with Coupang employees that maintained a physical presence and

---

[4] Defendant disputes whether U.S. or Korean law governed the employment agreement, because the employment agreement states California law governs, while the assignment agreement states Korean law governs. Dkt. # 68 at 13. However, the Court need not resolve this factual dispute at the motion to dismiss stage, because it is plausible that as alleged in the Complaint, California law governed the employment agreement.

conducted business in the United States, including California and Washington State. *See id.* ¶¶ 15, 16. Further, many of the retaliatory actions and decisions occurred in Washington and California. *See id.* ¶¶ 41, 49, 54.

There are some facts that support that the locus of the employment relationship was foreign in nature. Plaintiff worked for a Korean subsidiary of a U.S. parent company. *See* Dkt. # 59-1. Plaintiff was physically present in Korea during his employment. *See* Dkt. # 54 ¶ 10. During his employment, Plaintiff also oversaw compliance regarding Korean law. *See id.*

Smith and Coupang's employment relationship included a mix of foreign and domestic conduct and contact, but the facts weigh in favor of the locus of employment was domestic in nature. Here, the employment relationship is between a U.S. employee and a Korean employer (with close ties to its U.S. parent company), to be governed by U.S. law, with the employee residing in Korea. Plaintiff worked closely with U.S. counterparts and supervisors. Given Plaintiff's brief tenure with the company, much of his work was domestic in nature because it appears that a substantial amount of his working time was focused on the reporting of U.S. securities risks and violations, as well as dealing with the controversy and investigation into those issues. This case is distinguishable from *Daramola* because the employee there agreed Canadian law would govern the employment contract, whereas California law governed the employment agreement here. Importantly, one key factor distinguishing Plaintiff's case from *Daramola*, and the cases it analyzed, *Garvey* and *Carnero*, is that Mr. Smith is a United States citizen. Those cases all concerned non-citizens, and the courts placed significant weight on the fact that the plaintiffs were not U.S. citizens. Accordingly, the Court concludes that the application of the SOX anti-retaliation provision would be domestic

in nature, thus applying SOX to Plaintiff's whistleblower claim is permissible. Therefore, the Court will not dismiss Plaintiff's SOX claim on this basis.

### 3.    Protected Activity

Defendant argues that Plaintiff cannot establish a claim for relief under SOX because the Complaint does not allege Smith engaged in "protected activity" covered by the statute. *See* Dkt. # 58 at 20; *see also* Dkt. # 68 at 6–10. Defendant argues that Plaintiff only reported "risks related to" the fraud statutes listed in SOX, rather than reporting violations that can be protected by SOX. *See* Dkt. # 58 at 20. Plaintiff opposes dismissal, asserting that during his employment, he learned of Coupang's "numerous violations" that it was "obligated to disclose" to the United States government and to the company's shareholders via the appropriate SEC filings. Dkt. # 54 at ¶ 26; *see also* Dkt. # 63 at 9–14.

To state a prima facie claim under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, a plaintiff must plead that: 1) the employee engaged in a protected activity; 2) defendants knew or suspected, actually or constructively, that she engaged in the protected activity; 3) the employee suffered an adverse employment action; and 4) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009). As to the protected activity element, the anti-retaliation statute protects an employee who "provide[s] information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . ." 18 U.S.C. § 1514A(a)(1). The second to last segment, "any

1   rule or regulation of the [SEC]," refers to "administrative rules or regulations," not

2   statutes.  *See Wadler v. Bio-Rad Labs., Inc*., 916 F.3d 1176, 1186–87 (9th Cir. 2019).

3          The parties agree that the Sarbanes-Oxley Act anti-retaliation provision does not

4   afford protection to an employee who reports information about the violation of a statute

5   alone, such as the statute prohibiting the Iranian transactions, 15 U.S.C. §78m(r) of the

6   Securities Exchange Act.  *See* Dkt. # 63 at 11.  Plaintiff indicates that the statute, 15

7   U.S.C. §78m(r)(3), requires disclosure of the prohibited transactions in quarterly and

8   annual reports filed with the SEC.  Dkt. # 63 at 11–12. In making these disclosures, the

9   disclosing entity must follow certain SEC regulations including, 17 C.F.R. § 240.15d-13,

10  17 C.F.R § 249.310, 17 C.F.R. § 240.13a-15(f).  *See id*.  Plaintiff identifies these

11  regulations[5] and indicates that he reasonably believed the conduct complained of violated

12  the regulations.  *See* Dkt. # 54 ¶¶ 25–30, 29, 46, 56, 60.

13         First, Rule 17 C.F.R. § 240.13a-15 provides, in full:

14         Every issuer that has a class of securities registered pursuant to section 12 of the Act (15 U.S.C.
           78l), other than an Asset-Backed Issuer (as defined in § 229.1101 of this chapter), a small
15         business investment company registered on Form N-5 (§§ 239.24 and 274.5 of this chapter), or a
           unit investment trust as defined in section 4(2) of the Investment Company Act of 1940 (15 U.S.C.
16         80a-4(2)), must maintain disclosure controls and procedures (as defined in paragraph (e) of this
           section) and, if the issuer either had been required to file an annual report pursuant to section
17         13(a) or 15(d) of the Act (15 U.S.C. 78m(a) or 78o(d)) for the prior fiscal year or had filed an
           annual report with the Commission for the prior fiscal year, internal control over financial
18         reporting (as defined in paragraph (f) of this section).

19  Rule 13a-15 dictates that issuers of securities must maintain "disclosure controls and

20  procedures" and evaluate their effectiveness every fiscal quarter. 17 C.F.R. § 240.13a-

21  15(a)-(b).  The Rule defines "disclosure controls and procedures" to mean controls and

22  procedures "designed to ensure that information required to be disclosed by the issuer ...

23

---

24  [5] The Court observes that these regulations were not explicitly set forth in the Complaint.  However, the Court infers
    from the Complaint referring to the proper disclosure of the information in the "appropriate SEC filings," Dkt. # 54
25  ¶ 26, and Plaintiff's identification of the regulations in the opposition brief, *see* Dkt. # 63 at 9–14, that those filings
    mentioned in the Complaint must comply with the identified regulations.  Accordingly, the Court finds it appropriate
26  to consider the regulations in reviewing the plausibility of Plaintiff's SOX claim.

is recorded, processed, summarized and reported" in a timely manner. *Id*. § 240.13a-15(e). The issuer must also evaluate "internal control over financial reporting" every fiscal year, which requires the issuer to provide "reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements[.]" *Id*. §§ 240.13a-15(c)-(d), (f).

"Internal control over financial reporting" is defined as:

> a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> 1. Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> 2. Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and
>
> 3. Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

17 C.F.R. § 240.13a-15(f).

The Court concludes that Plaintiff has plausibly pleaded a SOX retaliation claim sufficient to survive dismissal, based upon the reasonable belief that he was reporting Coupang's violation of these SEC regulations for quarterly and annual disclosures. Here Plaintiff's allegations include an insistence to disclose the Iranian transactions, failure to maintain adequate KYC policies, and failure to establish sound and functional internal accounting and technology controls. *See* Dkt. # 54 ¶¶ 25–30, 29, 46, 56, 60. At the pleading stage, these assertions are plausible to state a SOX retaliation claim premised upon a reasonable belief as alleged in the Complaint. *See, e.g., Brinker v. Axos Bank*,

No. 22-cv-386, 2023 WL 7167851, at *5 (S.D. Cal. Oct. 31, 2023) (denying motion to dismiss a SOX whistleblower claim where plaintiff had the reasonable belief and complained of defendants' "failure to maintain adequate internal controls and inaccurate certification of those controls in its financial reports" as required by the SEC regulations). Accordingly, the Court denies the motion to dismiss on this basis.

### C.    Washington State Claims

Plaintiff asserts a claim under wrongful termination in violation of public policy under Washington law ("Washington WTVPP"). Dkt. # 54 ¶¶ 83–94. Defendant moves to dismiss these claims. *See* Dkt. # 58 at 27–31. The Court analyzes the claim below.

#### 1.    Wrongful Termination in Violation of Public Policy

Plaintiff asserts that he has a Washington WTVPP claim because he acted as a whistleblower and was terminated based on the authority and decisions of a Coupang officer based in Seattle, Washington. *See* Dkt. # 54 ¶¶ 49, 84–94; Dkt. # 63 at 28–30. Defendant argues that Washington law should not apply extraterritorially because at the time of termination Coupang was not a Washington employer and Smith was not a Washington employee. *See* Dkt. # 58 at 30–31; Dkt. # 68 at 16. Defendant also contends that Plaintiff has failed to state a claim for relief under Washington law. *See* Dkt. # 58 at 27–29; Dkt. # 68 at 14–17.

As a general rule, employees in Washington work at-will, meaning they can be terminated for any reason that is not unlawful. *See Rose v. Anderson Hay & Grain Co.*, 184 Wash. 2d 268, 275–282 (Wash. 2015). The tort of wrongful termination in violation of public policy is a narrow exception to the at-will employment rule. *See Thompson v. St. Regis Paper Co.*, 102 Wash. 2d 219, 232 (1984). The tort generally has been limited to circumstances where an employee was fired for: 1) refusing to commit an illegal act; 2) performing a public duty or obligation; 3) exercising a legal right or privilege; or 4) in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

retaliation for reporting employer misconduct, *i.e.*, whistleblowing.  *See Dicomes v. State*, 113 Wash. 2d 612, 618 (1989).  If an employee's claim falls within one of these categories, the employee must show his conduct was a "substantial factor" in the employer's termination decision.  *Rickman v. Premera Blue Cross*, 184 Wash. 2d 300, 314 (2015), *as amended* (Nov. 23, 2015).

There is no clear directive whether a non-resident of Washington State can bring a Washington WTVPP claim.  Plaintiff provided some support that Washington common law applies to non-Washington employees of Washington companies. *See Burnside v. Simpson Paper Co*., 123 Wash. 2d 93, 99 (1994) (finding that extraterritorial application of the Washington Law Against Discrimination was permissible because otherwise Washington employers would be able to discriminate against non-Washington resident employees).  In this case, although Plaintiff is not a Washington State resident, Plaintiff's claim is based on a supervisor's decision-making that purportedly occurred in Washington State.  This is sufficient to demonstrate that Plaintiff's Washington WTVPP claim should not be dismissed at this stage of the litigation.  *See Neely v. Boeing Co*., No. 16-cv-1791, 2018 WL 2216093, at *5 (W.D. Wash. May 15, 2018) (denying defendant's motion to dismiss a non-resident's WTVPP claim that was based on whistleblowing conduct).

Plaintiff need not prove that he has a valid whistleblowing claim under federal law in order to state a claim for wrongful discharge, only that his termination may have been motivated by reasons that violate the public policy of protecting whistleblowers. *See Thompson*, 102 Wash. 2d at 232.  The definition of "whistleblowing" under federal law is not the sole determinant of whether Plaintiff can be considered a "whistleblower" within the bounds of his wrongful discharge claim. Where, as here, the Court must credit all reasonable inferences arising from Plaintiff's allegations, his contention that his

ORDER - 17

termination was motivated by his alleged whistleblowing activities is sufficient to state a claim for wrongful discharge under Washington law. *See Neely*, 2018 WL 2216093, at *5. Accordingly, the Court denies the motion to dismiss Plaintiff's Washington WTVPP claim.

### D.    California Claims

Plaintiff brings claims under California law including: 1) California's Whistleblower Protection Act ("California WPA"); 2) wrongful termination in violation of public policy ("WTVPP claim") under California common law; and 3) breach of implied covenant of good faith and fair dealing under California law. Dkt. # 54 ¶¶ 65–82, 95–104. Defendant moves to dismiss these claims. *See* Dkt. # 58 at 23–27. The Court analyzes each claim below.

### 1.    California WPA

Defendant argues that Plaintiff's California WPA claim must be dismissed because Plaintiff failed to assert "crucial" California-based conduct to warrant application of California law. *See* Dkt. # 58 at 23–25. Plaintiff opposes dismissal but provides limited support in his argument. Dkt. # 63 at 31–32.

California Labor Code § 1102.5(b) prohibits an employer from retaliating against an employee "for disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct [a] violation or noncompliance . . . with a local, state, or federal rule or regulation." To establish a prima facie case of retaliation under § 1102.5(b), a plaintiff must show: 1) she engaged in protected activity, 2) she was thereafter subjected to adverse employment action by her employer, and 3) causation. *See Ferretti v. Pfizer Inc*., 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012) (quotations omitted).

First, California courts examining this statute have concluded that nothing in the language of § 1102.5 indicates the California legislature's intent for the statute to apply extraterritorially. *See Leibman v. Prupes,* No. 14-cv-09003, 2015 WL 3823954, at *7 (C.D. Cal. June 18, 2015).    Further, courts examining California's retaliation-based causes of action focus on "whether the individual's work had a substantial connection to California through the (1) situs of employment and (2) material elements of the cause of action." *Sexton v. Spirit Airlines, Inc.*, 2023 WL 1823487, at *3 (E.D. Cal. Feb. 8, 2023). To avoid an impermissible extraterritorial application of state law, a "crucial element" of a plaintiff's claim must have occurred in California. *English v. Gen. Dynamics Mission Sys., Inc.*, 808 F. App'x 529, 530 (9th Cir. 2020).

There is a clear directive from California courts that a Plaintiff's claim must have substantial connection to California to succeed in bringing a California WPA claim. Here, the Complaint lacks sufficient California-based conduct to warrant the application of the statute.   The Complaint alleges Smith raised issues with Coupang's Chief Accounting Officer, based in some unspecified part of the United States, and Assistant Corporate Secretary of Coupang, based in California offices. Dkt. # 54 ¶ 31. Looking at the Complaint as a whole, this single interaction is insufficient to support that a "crucial element" of the alleged retaliation occurred in California.  Further, a California choice of law provision in an employment contract does not transform this one event into a "crucial element" of Plaintiff's retaliation claim.   Accordingly, the facts as alleged in the Complaint do not support the extraterritorial application of the California WPA. Therefore, the Court dismisses Plaintiff's California WPA claim without prejudice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

###            2.        Wrongful Termination in Violation of Public Policy

Plaintiff's California WTVPP claims appear to be entirely based on his SOX and his California WPA claims. *See* Dkt. # 54 ¶¶ 72–82. Defendant moves to dismiss this claim as an impermissible extraterritorial application of California law. Dkt. # 58 at 25–26.

Under California law, a wrongful termination in violation of public policy claim must draw from a fundamental public policy embodied in a constitutional or statutory provision. *See Violan v. On Lok Senior Health Servs.*, No. 12-cv-05739, 2013 WL 6907153, at *13 (N.D. Cal. Dec. 31, 2013) ("An employer's discharge of an employee in violation of a fundamental public policy embodied in a constitutional or statutory provision can give rise to a tort action."). Federal district courts applying California law routinely dismiss common law wrongful termination claims based on California statutes where those claims are based on the same underlying conduct and contain the same deficiency as the statutory claims. *See English v. Gen. Dynamics Mission Sys., Inc.*, No. 18-908, 2019 WL 2619658, at *8 (C.D. Cal. May 8, 2019) (dismissing plaintiff's WTVPP claim because it was "based on the same underlying conduct" as a deficient statutory claim).

To the extent that Plaintiff's California WTVPP claim is tied to a violation of the California Labor Code, then this claim must be dismissed because Smith did not work or earn wages in California. *See Paparella v. Plume Design, Inc*., No. 22-cv-01295, 2022 WL 2915706, at *7 (N.D. Cal. July 25, 2022); *Wood v. iGATE Techs., Inc*., No. 15-cv-00799, 2016 WL 3548410, at *6 (N.D. Cal. June 30, 2016) (dismissing WTVPP claim based on alleged Labor Code violations where plaintiff did not earn wages in California). Accordingly, the Court dismisses Plaintiff's California WTVPP claims without prejudice.

### 3.    Covenant of Good Faith and Fair Dealing

Defendant argues Plaintiff failed to state a claim because he fails to identify a "benefit" that Defendant interfered with because Plaintiff only states that Defendant interfered with his "right to perform his duties," which is an obligation, not a benefit. *See* Dkt. # 68 at 16.  Additionally, Defendant argues that Plaintiff asserts this claim should survive because it is "in the context of written employment agreements" and because "Defendant unfairly interfered with, and deprived Plaintiff of, the benefit promised by the contract." Dkt. # 63 at 30–31.

In employment contracts, the implied covenant of good faith and fair dealing "cannot supply limitations on termination rights to which the party have not actually agreed." *Guz v. Bechtel Nat'l, Inc*., 24 Cal. 4th 317, 342 (2000).  An implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id*. at 349–350.  California Labor Code section 2922 "establishes the presumption that an employer may terminate its employees at will, for any or no reason. The employer may act peremptorily, arbitrarily, or inconsistently, without providing specific protections such as prior warning, fair procedures, objective evaluation, or preferential reassignment." *Id.*

Defendant is correct.  Plaintiff alleges that "Coupang unfairly interfered with and deprived Plaintiff of the benefits under his Employment Agreement by terminating his employment at least partially because of his performance of his obligations[.]" Dkt. # 54 at ¶ 101.  Here, Plaintiff appears to seek protection beyond his at-will employment status. Further, the interference Plaintiff alleges relates to an obligation rather than a benefit or a right that the law protects.  Accordingly, the Court dismisses this claim without prejudice.

1

2     **E.     Leave to Amend**

3          As the Court dismisses three claims without prejudice, the Court turns to whether

4     amendment is appropriate in this matter.

5                    **1.     Leave to Amend Dismissed Claims**.

6          In the event of dismissal of any claim, Plaintiff asks the Court for leave to amend.

7     Dkt. # 63 at 32.  Coupang opposes any amendment of the Complaint.  Dkt. # 58 at 31.

8     The parties provide little argument or support for their positions.

9           Leave to amend should be denied if amendment would be futile.  *See Airs*

10    *Aromatics, LLC v. Op. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600

11    (9th Cir. 2014).  Amendment is futile when a plaintiff's claims are based on threadbare

12    allegations and legal conclusions, the plaintiff fails to rebut any of the defendant's

13    arguments in the motion to dismiss, and there is an applicable defense to the claim

14    plaintiff alleges. *See Aguiar v. Cal. Sierra Express, Inc.*, No. 11-cv-02827, 2012 WL

15    1593202, at *2 (E.D. Cal. May 4, 2012).

16         Based on the record before the Court, the Court cannot conclude whether or not

17    amendment would be futile. If Plaintiff chooses to amend, the Court will permit Plaintiff

18    to file a proposed amended complaint within **ten (10)** days of this Order.  Thereafter, the

19    Court will review the proposed amended complaint and will provide further instructions

20    to the parties.

21                    **2.     Leave to Amend to Plead New Claims**

22         In a footnote, Plaintiff requests leave to amend a breach of contract claim under

23    Oregon law. Dkt. # 63 at 31 n.16. Defendant opposes. *See* Dkt. # 68 at 17.  Here, Plaintiff

24    points to no contractual provision to support amending to add this claim.  Accordingly,

25    the Court denies this request for leave to amend to add this claim.

26

ORDER - 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## V.    CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendant's Motion to Dismiss.  Dkt. # 58.  The Court GRANTS dismissal of Plaintiff's second, third, and fifth causes of action without prejudice.  The Court DENIES dismissal of Plaintiff's first and fourth causes of action.  Plaintiff may file a proposed amended complaint within **ten (10)** days of this Order.  Thereafter, the Court will determine whether amendment is appropriate.


DATED this 25th day of March, 2025.


_____

The Honorable Richard A. Jones
United States District Judge